**Neil F. KEEHN, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 12–27C

United States Court of Federal Claims.

Filed: March 1, 2013

Neil F. Keehn, Santa Monica, CA, pro se.

Michael D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington D.C., for the defendant. With him were Todd M. Hughes, Deputy Director, Jeanne E. Davidson, Director, Commercial Litigation Branch and Stuart F. Delery, Principal Deputy Assistant Attorney General, Civil Division.

HORN, J.

*Pro Se* **Plaintiff; Motion to Dismiss; Lack of Subject Matter Jurisdiction; Statute of Limitations; Breach of Contract; Fifth Amendment Taking; Intellectual Property.**

### OPINION

### FINDINGS OF FACT

Neil F. Keehn, a *pro se* plaintiff, asserts claims against the United States based on

thirty-one breaches of implied-in-fact contracts or, in the alternative, thirty-one claims based on the Takings clause of the Fifth Amendment to the United States Constitution, pursuant to 28 U.S.C. § 1491 (Supp. V 2011). Plaintiff also alleges that the equitable doctrines of quantum meruit and unjust enrichment provide a basis for his claims.

Mr. Keehn's complaint states, "[t]his Claim is based upon a precept that is as old as humankind itself: a man is worth his daily bread." He notes that, "[i]n 1970, armed with a bachelors degree in mathematics, and a masters degree in electrical engineering, Plaintiff decided to devote his career to national defense," which "resulted in a huge mistake on his part." Mr. Keehn's complaint also states that, "over a period from 1975 until 1992, he became **solely** responsible for technological innovations that have generated an estimated $8.7B, yes, **billion** in corporate revenues, that continue to grow to this very day." (emphasis in original). Mr. Keehn alleges that he "never received any monetary compensation for the intellectual property that has led to billions of dollars in corporate revenues for the defense industry as well as valuable contributions to national security policy and guidance for the Government." Mr. Keehn further alleges he worked for a number of different employers throughout his career, including the Boeing Company, Northrop Grumman Corporation, and Science Applications, Inc. Mr. Keehn also claims that he completed various projects for the Central Intelligence Agency, the United States Department of Defense, and the United States Air Force, and that he owned and operated his own company, Strategic Systems Sciences, Inc., from 1981 to 1990.[1]

Plaintiff described his work for Northrop Grumman, as follows:

[M]ost of the people that plaintiff worked for told him repeatedly that since he enjoyed his work so much, he should be working 24/7, and, if there was any justice in the world, he would be paying them for the honor and the privilege to do so. But this wasn't the first employer that Plaintiff had had that had spewed such nonsense. If there is a defense company in this country that is a good employer for those who seek an honest day's pay for an honest day's work, Plaintiff does not know of it. They're all the same, just horrible places to work for those employees responsible for getting the work done.

Plaintiff expressed frustration with the concept of working for the defense industry on his "own time," stating:

At this point, let's be clear about the concept of one's "own time." It is standard in this country to work 40 hours per week for the salary that is provided to the employee. If a situation arises in which more than 40 hours are required, such as when a proposal is being prepared, employees, usually engineers, often work much longer hours. There are two recognized remedies for this circumstance. The most widely one [sic] is to allow the employee to take compensatory time off to offset the time that the employee worked for more than 40 hours in a week once the task is completed. The alternative policy is to put the employee on paid overtime. But the defense industry frowns upon both of these policies for those engineers that are highly productive. In the case of such employees, the implicit, if not explicit policy is for the highly productive engineer to be prepared to work as many hours per week as his or her management demands, without any compensation other than his or her weekly salary. For such individuals, the concept of one's "own time" simply does not exist, and Plaintiff was warned on several occasions in the 1970s not to assert that he possessed his "own time." Of course, demanding a 24/7 workweek violates federal law under the McNamara–O'Hara Act, but it was nonetheless accepted practice for those few engineers in any given organization who were held responsible for getting the work done. For those who were lazy sycophants, management didn't care whether they ever did any work because at

---

1. Based on the plaintiff's allegations, the court instructed defendant to review the filings to determine if any information was classified and needed to be redacted. After review, the defendant concluded that "none of the information in any of the filings" contain protected or sensitive information.

the very least, such people generated overhead revenues, which helped pay for management. That is one reason national defense is so expensive.

Plaintiff explains that his frustration stems from the fact that, "most of the intellectual property that is the subject of this Claim that resulted in the technological innovations described below was generated on his own time without any payment for his time or materiel [sic]."

In summary form, the following are the thirty-one allegations made by Mr. Keehn, together with amounts he requests as compensation.[2] They appear to derive from tasks Mr. Keehn alleges he completed.

1. Developed the Special Access Communication System, for which plaintiff seeks $2,120,000.00.[3] Plaintiff alleges to have worked on this space system program in "the late 1980s."

2. Developed Special Demodulators for radar signal modulations, for which plaintiff seeks $50,000.00. Plaintiff alleges to have begun his work on this task in 1975 and learned that he did not receive compensation for this work in 1979.

3. **"Developed Multispectral/Hyperspectral Imagery Applications Program,"** for which plaintiff seeks $20,000,000.00. (emphasis in original). According to Mr. Keehn, "[p]laintiff began his quest to introduce the strategic applications of multispectral imagery technology by writing a white paper, in October 1978, which he then sent to two officers at Strategic Air Command headquarters." Plaintiff alleges that, "[b]y the summer of 1980, **Science Applications, Inc** [sic] had reneged on its promises to Plaintiff regarding the multispectral

imagery opportunity." (emphasis in original).

4. **"Provided foundation for the Military LANDSAT Space System,"** a series of Earth-observing satellite missions jointly managed by NASA and the United States Geological Survey, for which plaintiff seeks $20,000,000.00. (emphasis in original). In 1984, plaintiff alleges he met with Marvin Richman, a "retired Air Force colonel as well as a Central Intelligence Agency retiree," who allegedly told plaintiff that "he had just been to a meeting of the Air Force Scientific Advisory Board. Mr. Richman had seen Plaintiff's original briefing presented at that meeting."

5. **"Developed the Satellite Communication Relay concept, which became the M–22 Tactical Network,"** for which plaintiff seeks $20,000,000.00. (emphasis in original). Plaintiff alleges he developed this concept in 1976, at which time the Boeing Company personnel "began to brief it around the intelligence community."

6. Developed system and operational concepts for utilization of the Space Transportation System for Crisis Reconnaissance, for which plaintiff seeks $25,000,000.00. Plaintiff states that he "suggested that the Shuttle could be used for crisis reconnaissance" in 1977, and that he "managed this study until his departure for **Science Applications, Inc.**" in 1980. (emphasis in original). According to plaintiff, "by that time, the management of **Northrop Grumman Corporation**, having told Dr. Babcock and his people that they

---

**2.** Plaintiff does not include specific dates on which the alleged breaches of implied-in-fact contracts or takings supposedly occurred, nor does he always name the United States official or officials involved in the alleged takings. As noted by defendant in its motion to dismiss, "[a]lthough quite lengthy, no where [sic] in his complaint does Mr. Keehn state with particularity the date the alleged takings or breaches occurred. Nor does he name the official or officials who authorized the alleged takings upon behalf of the United States or entered into the alleged implied-in-fact contracts. With the exception of task

number 31, all of the tasks forming the basis for this complaint appear to have occurred before 1993."

**3.** In his complaint, in a section titled, "Summary of Funded Programs for which Compensation is Sought," plaintiff, however, claims the "amount due" for the development the Special Access Communication System is $2,000,000.00. There are similar inconsistencies elsewhere in the complaint.

did not know what they were doing, resulted in a cancellation of the program." (emphasis in original).

7. Identified ten missions for the Inertial Upper Stage for operational support to strategic forces, for which plaintiff seeks $1,080,000.00. According to plaintiff, "[o]n November 18, 1981, Plaintiff went to the White House to brief **Dr. Victor H. Reis,** then-Assistant Director of the Office of Science and Technology Policy in the Executive Office of the President. While Plaintiff did not receive a contract to further develop the concept of utilizing OTVs [orbital transfer vehicles], he started a process that lead to their use, for which he spent many thousands of dollars of his own funds, and for which he never received any monetary compensation whatsoever." (emphasis in original). Plaintiff states, "[t]his technological innovation purportedly became a highly classified program when it was illegally misappropriated by a retiring Air Force general who didn't understand military operations. Thus, that particular program was cancelled after two years."

8. **"Developed a series of electronic warfare methods against adversary satellites to enhance strategic operations,"** for which plaintiff seeks $432,000.00. (emphasis in original). According to plaintiff, "[t]his task was commenced in 1980," and in 1987, "plaintiff found that his work had been funded to another company."

9. Developed utilization concept for retired boosters (e.g., the THOR, an intermediate range ballistic missile) to enhance United States strategic operations, for which plaintiff seeks $72,000.00. Plaintiff states that he began work on this task in 1983. George D. Miller, then a Lieutenant General of the United States Air Force, wrote to plaintiff on June 26, 1984, saying that, "[t]he possible benefits of the proposal do not support the funding required to effect launch of the remaining nine Thor boosters."

10. **"Identified ten satellite relay services in support of Department of Defense roles and missions,"** for which plaintiff seeks $432,000.00. (emphasis in original). According to plaintiff, "[i]n the 1984–85 time-frame, Plaintiff developed ten satellite relay concepts to reduce costs of national defense."

11. **"Developed roles and missions for Strategic Air Command's Space Master Plan,"** and presented the methodology to the Strategic Air Command for free in March 1983, for which plaintiff now seeks $1,440,000.00. (emphasis in original).

12. **"Provided United States Space Command with an approach to strategy and doctrine for military space systems,"** which was later implemented, for which plaintiff seeks $576,000.00. (emphasis in original). Plaintiff explains "[i]n 1985, Plaintiff served on a defense industry-wide panel whose charter it was to develop options for establishing a national military space strategy that could be implemented by the Air Force Space Command." According to plaintiff, the United States Department of Defense, which "certifies contractors as competent and ethical to assist in providing for the common defense," allegedly "implicitly acknowledged" its responsibility to compensate plaintiff "in the late 1980s when it [the Department of Defense] assisted **Northrop Grumman Corporation** in establishing the GainSharing bonus program in which the DoD funded the rewarding of outstanding performance by **Northrop Grumman Corporation** employees." (emphasis in original).

13. **"Developed a series of space force structure planning databases"** in 1987, for which plaintiff seeks $2,160,000.00. (emphasis in original).

14. Provided support to the Central Intelligence Agency's Office of Strategic Research and the President's National Security Advisor on the generation

of the first National Intelligence Estimate on the Soviet space force structure, for which plaintiff seeks $144,000.00. According to plaintiff, "[o]n five occasions between 1978 and 1988, the United States Government requested plaintiff's assistance in developing solutions to high-value national security problems, and in all five instances Northrop Grumman Corporation told the Government that it would not honor its request." (emphasis in original).

15. "Briefed the Strategic Air Command's Program Evaluation Group on Space as a Critical Strategic Arena," for which plaintiff seeks $432,000.00 in 1981. (emphasis in original).

16. Created the first briefing on strategic issues in space that was presented to President Reagan during his transition period, for which plaintiff has yet to assess the alleged damages. Plaintiff does not specify the year in which he wrote this briefing, but he refers to "then-President-elect Ronald Reagan," placing his claim between late 1980 and early 1981. (emphasis in original).

17. "Authored the Monograph 'Strategic Utilization of Space Force Structures in a Protracted Strategic Conflict: A Net Assessment,'" for which plaintiff seeks $720,000.00. (emphasis in original). Plaintiff states that "[i]n March 1980, Plaintiff authored a monograph of approximately one hundred pages in length." According to plaintiff, "[t]he Monograph was required reading for all uniformed officers in the Pentagon who dealt with space issues. It also became the keynote document for the course in Space Operations at the Air Force's Air Command and Staff College" in March 1982.

18. Plaintiff was allegedly asked to come to a "Space Doctrine Symposium" to "explain the fundamental differences between basic doctrine and operational doctrine" in November 1985, and he was "asked to reduce his input to a formal set of charts, which he did, and delivered them to the Air Force in December of that year." (emphasis in original). Plaintiff seeks $144,000.00 for this effort.

19. "Developed the concept of 'traceability architecture' to generate methods for evaluating and selecting reconnaissance and surveillance systems for a particular mission or set of missions," for which plaintiff seeks $576,000.00. (emphasis in original). Plaintiff allegedly "developed a methodology for selecting reconnaissance and surveillance systems as a function of a specific set of military missions" while employed by Northrop Grumman Corporation in 1978.

20. Supported the Central Intelligence Agency's Office of Strategic Research's critique of the proposed Multiple Protective Shelter approach to the basing of the M–X missile in the 1980s, for which plaintiff seeks $144,000.00.

21. "Developed the dynamic deterrence approach to the M–X basing problem," for which plaintiff seeks $158,400.00. (emphasis in original). Plaintiff allegedly developed this approach. In 1983, plaintiff allegedly wrote and delivered to the Pentagon a "white paper describing his 'dynamic deterrence' approach to the basing problem."

22. Developed a new strategic targeting doctrine, based upon "response in kind," which was then implemented, for which plaintiff seeks $216,000.00. According to Mr. Keehn, "[i]n the Spring of 1977, Plaintiff audited a ... Workshop in Strategic Studies at the RAND Graduate Institute for Policy Sciences in Santa Monica, California.... The Boeing Company management clearly stated to Plaintiff that it had no interest in using any of the knowledge base that Plaintiff acquired during the workshop. As a part of the requirements of the

course, each student was required to write a lengthy paper. In Plaintiff's 45–page paper (**Systems Requirements for Flexible Strategic Options**), he became the first to develop a formal definition of response in kind. People at RAND put his paper into The System, and in 1982, plaintiff's targeting doctrine became national policy." (emphasis in original).

23. **"Developed presumptive Soviet targeting doctrine"** for an anti-satellite weapons system, for which plaintiff seeks $324,000.00. (emphasis in original). "In 1981, Plaintiff was invited by the Air War College to present his presumptive Soviet targeting doctrine for its anti-satellite (ASAT) weapons. Plaintiff did so in February 1981 at the annual Air Power Symposium."

24. **"Developed an analytical approach for assessing the time-sensitive dynamic nature of strategic target value,"** for which plaintiff seeks $216,000.00. (emphasis in original). Although plaintiff does not specify the date of the event that gave rise to this claim, and states that he does not "have any unclassified exhibits to support this specific claim," he refers to "key developments in the late 1970s and early 1980s" that led him to "develop[ ] a methodology to assist the Strategic Air Command and the Joint Strategic Target Planning Staff in assessing the viability of a particular flexible strategic option in light of the requirements that it may impose on various space assets."

25. **"Developed concepts for utilizing United States satellite negation assets to enhance United States strategic operations,"** for which plaintiff seeks $288,000.00. (emphasis in original). According to the plaintiff, "[i]n Plaintiff's aforementioned Monograph, he had one chart on the utilization of United States satellite negation systems for use against adversary satellites, particularly as part of flexible strategic options. He was encouraged by the Air Force to embellish this intellectual property so that a more fully comprehensive evaluation of satellite negation options could be done."

26. **"Developed operational concepts for utilizing Strategic Defense Initiative space systems to enhance United States strategic operations,"** for which plaintiff seeks $144,000.00. (emphasis in original). Plaintiff alleges that, "[i]n 1985, upon his return to Northrop Grumman Corporation, Plaintiff began to work on the space systems associated with the Strategic Defense Initiative (SDI)," and that "Plaintiff traveled to Strategic Air Command Headquarters in December 1986 to discuss all relevant issues with the appropriate officers," at which time "[a]n agreement was reached in which **Northrop Grumman Corporation** would invest the first $50,000 in a study.... But a **Northrop Grumman Corporation** marketing manager, feeling wounded because he did not receive the opportunity to approve this potentially new line of business, demanded that all efforts associated with task be terminated." (emphasis in original).

27. **"Developed arms control monitoring technology development plan,"** for which plaintiff seeks $216,000.00. (emphasis in original). According to plaintiff, "[i]n 1990, Plaintiff wrote a systems engineering management plan for a billion-dollar space system.... This was all done as an employee of **Northrop Grumman Corporation** for which plaintiff received his weekly salary, however inferior.... At a conference on arms control, held at the State Department in June 1990, Plaintiff approached a senior **Central Intelligence Agency** official to gauge his reaction to Plaintiff's proposal ... the official requested that Plaintiff provide an unsolicited proposal to the **Central Intelligence Agency** as quickly as possible.... But **Northrop Grumman Corporation** re-

fused to pursue this new business opportunity." (emphasis in original).

28. **"Developed the concept of secondary indicators for arms control monitoring and verification,"** for which plaintiff seeks $72,000.00. (emphasis in original). According to Mr. Keehn, "[p]laintiff developed the concept of secondary indicators that would permit an intelligence analyst to verify the data from the intercepted downlink from a test missile. His white paper on this issue led to a six-week long White House-based study group early in the Reagan administration."

29. **"Developed a SALT [Strategic Arms Limitation Treaty] verification strategy based upon the concept of non-compliance specification,"** for which plaintiff seeks $72,000.00. (emphasis in original). According to plaintiff, his "white paper on this subject in 1979 was briefed to members of the California Seminar on Arms Control and International Security."

30. **"Developed an easy-to-use flowchart for military strategy development and assessment,"** for which plaintiff seeks $259,200.00. (emphasis in original). Plaintiff alleges that in 1987, he "decided to do a more in-depth study of what constitutes military strategy according to the experts throughout history. He read and studied numerous books and professional papers from the fall of 1987 until the end of 1989. At that point, he reduced his findings developed over this nearly two-and-a-half-year period to a flowchart with sixteen elements on it. . . . Air Force **Colonel Richard Szafranski,** purportedly sent copies of Plaintiff's intellectual property to several war colleges where it reportedly has been used extensively. . . . Plaintiff did not get the opportunity to potentially sell his chart before the Air Force reportedly gave it away." (emphasis in original).

31. **"Developed a short course on the strategic concepts used during the Cold War to develop national security policy and guidance,"** for which plaintiff seeks $324,000.00. (emphasis in original). The thirty-first task alleges that the Air Force improperly used a short academic course developed by plaintiff on the strategic concepts used during the Cold War to develop national security policy and guidance.

Regarding the thirty-first task, Mr. Keehn alleges:

> In 2008, the Department of Defense commissioned a study of the two nuclear mishaps that occurred in recent years. This effort, **The Task Force on DoD Nuclear Weapons Management,** was chaired by **former Defense Secretary James R. Schlesinger,** and resulted in a two-phase final report. One of the key recommendations articulated by the task force was the serious need for the current officer corps to become conversant with the strategic concepts that were employed during the Cold War to formulate national security policy and guidance.

(emphasis in original). Plaintiff also alleges that he formed the Nuclear Deterrence Education Initiative, which plaintiff claims was a four-day course "designed to educate those officers in the various Services that would benefit from a thorough and rigorous grounding in the concepts of strategic deterrence, stability and flexibility that were the cornerstones of national security policy and guidance throughout the Cold War." Regarding the thirty-first task, plaintiff also states: "The courseware for the proposed course is centered upon a 205–page seminar book authored by the Plaintiff. These course notes provide a detailed definition of 35 different concepts related to deterrence, stability or flexibility, and an assessment of each concept plus a long list of ancillary material." Plaintiff claims:

> Working through a long-time friend, retired Air Force **General Lance W. Lord,** plaintiff was able to capture the interest in his course from both former-Secretary Schlesinger, and the commander of the then-new Air Force Global Strike Command (hereinafter AFGSC), **Lt. General**

**Frank G. Klotz.** General Klotz told General Lord that he wanted to have the entire officer corps of AFGSC to hear Plaintiff's four-day course, but that he needed time to get his new command organized. Against Plaintiff's wishes General Lord inadvertently gave a copy of Plaintiff's course notes to General Klotz, which General Klotz does not believe occurred.

(emphasis in original).

Mr. Keehn alleges he developed the course and presented it to the Air Force in the 2008–2009 time-frame. He further alleges that the Air Force informed him that it was not interested in his course materials, but did so only "[a]fter keeping the Plaintiff in limbo for more than a year, Air Force Global Strike Command suddenly concluded that it was not interested in Plaintiff [sic] course after all." Exhibit 18 to Mr. Keehn's complaint is an undated letter from Jeffrey K. Beene, Air Force Strike Command Director of Staff, returning Mr. Keehn's course materials. Mr. Beene wrote, in pertinent part, "Air Force Global Strike Command does not have a current need for your course. . . . Enclosed is our only copy of your NDEI [Nuclear Deterrence Education Initiative] materials. I want to assure you that while in our possession, our staff safeguarded your materials from unauthorized distribution and diligently protected your intellectual property." Plaintiff alleges that "the Air Force had copies of Plaintiff's intellectual property in the form of his course notes to review," and that these course notes "consist of twenty-five thousand words of material."

Plaintiff asserts that the "Total Fees for Funded Programs" (tasks 1–6) amount to $87,050,000.00 in damages, the "Total Opportunity Costs for National Security Policy and Guidance Development Tasks" amount to $10,641,600.00 in damages, and the "Total Accounting costs for National Security Policy and Guidance Development Tasks" (tasks 7–31) amount to $12,000.00. Therefore, according to plaintiff, his total claim for damages for all thirty-one tasks amounts to $97,703,600.00. He contends that he should receive compensation in this amount for either breaches of contract or takings by the government. He also requests that this court issue a declaratory judgment, affirming that "until Plaintiff dies . . . he is an American citizen, and is thus eligible for all of guarantees and civil rights, as articulated in the United States Constitution and all federal laws that pertain thereto."

In addition to his breach of contract and takings theories, Mr. Keehn tries to base his claims on the equitable doctrines of unjust enrichment and quantum meruit. According to plaintiff, "[u]njust enrichment is a general equitable principle that no person (or organization) should be allowed to profit at another's expense without making restitution for the reasonable value of any property, services, or other benefits that have been unfairly received and retained." Plaintiff continues:

> Various courts throughout Western history have established the elements of a cause of action for unjust enrichment. These elements are: (1) the enrichment of the party accused of unjust enrichment; (2) that such enrichment was at the expense of the party seeking *restitution;* and (3) the circumstances were such that in *equity* and good conscience restitution should be made. An additional requirement is that the party accused of unjust enrichment must know of the benefit conferred; to ensure that the benefit was not *foisted* on the recipient, and is something for which compensation is reasonably expected. A careful reading of the description of each of the tasks completed by the Plaintiff that then have been funded by the United States Government will attest to the fact that each element of unjust enrichment has been satisfied.

(emphasis in original).

Plaintiff defines and describes the elements of quantum meruit as follows:

> Quantum meruit is likewise an equitable doctrine, and means "as much as deserved," and it is derived from the doctrine of unjust enrichment. Unjust enrichment is that which is obtained, while quantum meruit is "as much as deserved," and serves as a measure of liability from an

implied-in-fact contract.[4]

In a manner similar to unjust enrichment, Courts have crafted four basic elements that the plaintiff must prove before he may recover under the doctrine of quantum meruit: (1) that valuable services were rendered; (2) that the services were rendered to the defendant; (3) that the services were accepted, used, and enjoyed by the defendant; and (4) that the defendant was aware that the plaintiff, in performing the services, expected to be paid by the defendant. For those tasks described in this Claim that contributed [sic] United States National Security Policy and Guidance, it is shown that all elements of quantum meruit have been met.

Plaintiff further notes: "The specific projects associated with individual claims articulated herein fall into two categories: those that became funded programs, and those that contributed to United States National Security Policy and Guidance. The first category is covered by the unjust enrichment doctrine, and the second category by the quantum meruit doctrine." Regarding the unjust enrichment and quantum meruit doctrines, plaintiff claims "[w]hile there have been an untold number of cases where a plaintiff has sought monies from the United States Government under these doctrines, Plaintiff has failed to find a cases [sic] that is directly on point vis-à-vis his case." Mr. Keehn states that, "from a legal perspective it appears to Plaintiff that each project under each category are legally equivalent, it does not make sense to the Plaintiff as a non-lawyer to attempt to ascribe individual precedents to individual projects. Therefore, he simply lists the precedents below that he believes have legal connection to his Claim."

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), defendant filed a motion to dismiss Mr. Keehn's complaint. According to defendant, the six-year statute of limitations that applies to claims brought in the United States Court of Federal Claims bars thirty of Mr. Keehn's thirty-one claims. Defendant also claims that Mr. Keehn has "failed to allege the jurisdictional perquisites [sic] for asserting claims based upon the Fifth Amendment Takings clause and breach of implied-in-fact contracts."

## DISCUSSION

In his complaint, Mr. Keehn, acting *pro se*, reminds that: "Plaintiff is not a lawyer, and does not seek to act like one." When determining whether a complaint filed by a pro se plaintiff is sufficient to invoke review by a court, *pro se* plaintiffs are entitled to liberal construction of their pleadings. *See Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (requiring that allegations contained in a *pro se* complaint be held to "less stringent standards than formal pleadings drafted by lawyers"), *reh'g denied*, 405 U.S. 948, 92 S.Ct. 963, 30 L.Ed.2d 819 (1972); *see also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Hughes v. Rowe*, 449 U.S. 5, 9–10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh'g denied*, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977). "However, ' "[t]here is no duty on the part of the trial court to create a claim which [the plaintiff] has not spelled out in his [or her] pleading." ' " *Lengen v. United States*, 100 Fed.Cl. 317, 328 (2011) (alterations in original) (quoting *Scogin v. United States*, 33 Fed.Cl. 285, 293 (1995) (quoting *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir.1975))); *see also Bussie v. United States*, 96 Fed.Cl. 89, 94, aff'd, 443 Fed.Appx. 542 (Fed.Cir.2011); *Minehan v. United States*, 75 Fed.Cl. 249, 253 (2007). "While a *pro se* plaintiff is held to a less stringent standard than that of a plaintiff represented by an attorney, the *pro se* plaintiff, nevertheless, bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence." *Riles v. United States*, 93 Fed.Cl. 163, 165 (2010) (citing *Hughes v. Rowe*, 449 U.S. at 9, 101 S.Ct. 173 and *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed.Cir.) ("Plaintiff bears the burden

---

**4.** As explained below, unjust enrichment generally relates to implied-in-law contracts, rather than implied-in-fact contracts.

of showing jurisdiction by a preponderance of the evidence."), *reh'g and reh'g en banc denied* (Fed.Cir.2002)).

■ It is well established that " 'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.' " *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (quoting *United States v. Cotton*, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, — U.S. ——, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011); *see also Hertz Corp. v. Friend*, 559 U.S. 77, 130 S.Ct. 1181, 1193, 175 L.Ed.2d 1029 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing *Arbaugh v. Y & H Corp.*, 546 U.S. at 514, 126 S.Ct. 1235)); *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1342 (Fed.Cir.2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing *Johannsen v. Pay Less Drug Stores N.W., Inc.*, 918 F.2d 160, 161 (Fed.Cir.1990))); *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 963 (Fed.Cir.1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction ... may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. at 506, 126 S.Ct. 1235; *see also Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed.Cir.2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing *Arbaugh v. Y & H Corp.*, 546 U.S. at 506, 126 S.Ct. 1235; *Folden v. United States*, 379 F.3d 1344, 1354 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2004), *cert. denied*, 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005); and *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir.1998))); *Pikulin v. United States*, 97 Fed.Cl. 71, 76, *appeal dismissed*, 425 Fed. Appx. 902 (Fed.Cir.2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where ... neither party has raised this issue." *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1369 (Fed.Cir.) (citing *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1485 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (Fed. Cir. 1998)), *reh'g and reh'g en banc denied* (Fed. Cir. 2004), *cert. granted in part*, 546 U.S. 975, 126 S.Ct. 543, 163 L.Ed.2d 458 (2005), *cert. dismissed as improvidently granted*, 548 U.S. 124, 126 S.Ct. 2921, 165 L.Ed.2d 399 (2006).

■ Pursuant to the RCFC and the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2012); Fed.R.Civ.P. 8(a)(1), (2) (2012); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed.Cir.) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)), *reh'g denied* (Fed. Cir. 1997); *see also Klamath Tribe Claims Comm. v. United States*, 97 Fed.Cl. 203, 208 (2011); *Gonzalez–McCaulley Inv. Grp., Inc. v. United States*, 93 Fed.Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed.Cir. 1998); *see also McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1363 n. 9 (Fed.Cir.2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, *Federal Practice and Procedure* § 1286 (3d ed.2004)). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceiva-

ble to plausible.'" *Three S Consulting v. United States*, 104 Fed.Cl. 510, 523 (2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). As stated in *Ashcroft v. Iqbal*, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' [*Bell Atl. Corp. v. Twombly*,] 550 U.S. at 555 [127 S.Ct. 1955]. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 557, 127 S.Ct. 1955).

■ When deciding a case based on a lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Erickson v. Pardus*, 551 U.S. at 94, 127 S.Ct. 2197 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555–56, 127 S.Ct. 1955 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002))); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), *recognized by Davis v. Scherer*, 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327–28 (Fed.Cir.2006); *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed.Cir.2005); *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed. Cir. 2002), *cert. denied*, 538 U.S. 906, 123 S.Ct. 1484, 155 L.Ed.2d 226 (2003).

■ The Tucker Act grants jurisdiction to this court as follows:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Navajo Nation*, 556 U.S. 287, 289–90, 129 S.Ct. 1547, 173 L.Ed.2d 429 (2009); *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *see also Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 875 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2007), *cert. denied*, 552 U.S. 1142, 128 S.Ct. 1082, 169 L.Ed.2d 810 (2008); *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed.Cir.1999).

■ "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States...." *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003); *Smith v. United States*, No. 2012–5105, 2013 WL 646332, at *2, 709 F.3d 1114, 1115–16 (Fed.Cir. Feb. 22, 2013); *RadioShack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed. Cir.2009); *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d at 1343 ("[P]laintiff must ... identify a substantive source of law that creates the right to recovery of money damages against the United States."). In *Ontario Power Generation, Inc. v. United States*, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

The underlying monetary claims are of three types.... First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver.... Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and

seeks return of all or part of that sum." *Eastport S.S. [Corp. v. United States*, 178 Ct.Cl. 599, 605–06,] 372 F.2d [1002,] 1007–08 [ (1967) ] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket' ") (quoting *Clapp v. United States*, 127 Ct.Cl. 505, 117 F.Supp. 576, 580 (1954)).... Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." *Eastport S.S.*, 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." *Id.*; *see also Testan* [*v. United States*], 424 U.S. [392,] 401–02, 96 S.Ct. 948 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim—whether it be the Constitution, a statute, or a regulation—does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself.... can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " (quoting *Eastport S.S.*, 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

*Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed.Cir.2004); *see also Twp. of Saddle Brook v. United States*, 104 Fed.Cl. 101, 106 (2012).

 To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon " 'can fairly be interpreted as mandating compensation by the Federal Government.' " *United States v. Navajo Nation*, 556 U.S. at 290, 129 S.Ct. 1547 (quoting *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)); *see also United States v. White Mountain Apache Tribe*, 537 U.S. at 472, 123 S.Ct. 1126; *United States v. Mitchell*, 463 U.S. at 217, 103 S.Ct. 2961; *Blueport Co.,*

*LLC v. United States*, 533 F.3d 1374, 1383 (Fed.Cir.2008), *cert. denied*, 555 U.S. 1153, 129 S.Ct. 1038, 173 L.Ed.2d 468 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. *See United States v. Navajo Nation*, 556 U.S. at 290, 129 S.Ct. 1547 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[ ] that operate[s] to waive sovereign immunity for claims premised on other sources of law (*e.g.,* statutes or contracts).")." " 'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.' " *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1308 (Fed.Cir.2008) (quoting *Greenlee Cnty., Ariz. v. United States*, 487 F.3d at 876); *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed.Cir.2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); *Peoples v. United States*, 87 Fed.Cl. 553, 565–66 (2009).

**Statute of Limitations**

 Pursuant to 28 U.S.C. § 2501 (2006), suits against the United States are subject to a six-year statute of limitations. According to 28 U.S.C. § 2501:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.... A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

*Id.* "The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims." *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed.Cir.), *reh'g en banc denied* (Fed. Cir. 2006), *aff'd*, 552 U.S. 130, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008); *Banks v. United States*, 102 Fed.Cl. 115, 127 (2011) (citing U.S.C. § 2501). The United States Court of Appeals for the Federal Circuit has indicated that a claim accrues " ' "when all events have occurred to fix

the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." ' " *San Carlos Apache Tribe v. United States*, 639 F.3d 1346, 1358–59 (Fed.Cir.) (quoting *Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed.Cir.2005)(quoting *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed.Cir.2003), *cert. denied*, 540 U.S. 1177, 124 S.Ct. 1404, 158 L.Ed.2d 76 (2004))), *reh'g en banc denied* (Fed. Cir. 2011); *see also FloorPro, Inc. v. United States*, 680 F.3d 1377, 1381 (Fed.Cir. 2012); *Martinez v. United States*, 333 F.3d at 1303 ("A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, *i.e.*, when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.' ") (quoting *Nager Elec. Co. v. United States*, 177 Ct.Cl. 234, 240, 368 F.2d 847, 851 (1966), *motion denied*, 184 Ct.Cl. 390, 396 F.2d 977 (1968)); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988); *see also Brizuela v. United States*, 103 Fed.Cl. 635, 639, *aff'd*, 492 Fed. Appx. 97 (Fed.Cir.2012), *petition for cert. filed* (U.S. Nov. 2, 2012). A Judge of the United States Court of Federal Claims has noted that:

> It is well-established that a claim accrues under section 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.' " *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed.Cir.2003) (en banc), *cert. denied*, 540 U.S. 1177, 124 S.Ct. 1404, 158 L.Ed.2d 76 (2004) (quoting *Nager Elec. Co. v. United States*, 368 F.2d 847, 851 (Ct.Cl.1966)); *see also Samish [Indian Nation v. United States]*, 419 F.3d [1355,] 1369 [ (2005) ]. Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely. *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998); *Entines v. United States*, 39 Fed.Cl. 673, 678 (1997), *aff'd*, 185 F.3d 881 (Fed.Cir.), *cert. denied*, 526 U.S. 1117, 119 S.Ct. 1766, 143 L.Ed.2d 796 (1999); *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d

1345, 1362 (Fed.Cir.2006) (Newman, J., dissenting); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir.1988).

*Parkwood Assocs. Ltd. P'ship v. United States*, 97 Fed.Cl. 809, 813–14 (2011), *aff'd*, 465 Fed.Appx. 952 (Fed.Cir.2012); *see also Klamath Tribe Claims Comm. v. United States*, 97 Fed.Cl. 203, 209 (2011) (citing *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998)). Accrual of a claim is " 'determined under an objective standard' " and plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue. *FloorPro, Inc. v. United States*, 680 F.3d at 1381 (quoting *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed.Cir.1995), *cert. denied*, 517 U.S. 1243, 116 S.Ct. 2496, 135 L.Ed.2d 189 (1996)).

For each of plaintiff's claims to be timely, each claim must have accrued no earlier than January 12, 2006, or six years prior to January 12, 2012, the date Mr. Keehn filed his complaint in this court. With the exception of the thirty-first task, which allegedly took place in the 2008–2009 time-frame, defendant argues that because plaintiff's claims began accruing no later than 1993, the statute of limitations has run on Mr. Keehn's first thirty claims. As described above, among other allegations, in the 1970s, Mr. Keehn alleges that he developed Special Demodulators for radar signal modulations, a "multispectral/hyperspectral imagery applications program," developed the Satellite Communication Relay concept, managed a study of the Space Transportation System for Crisis Reconnaissance, the concept of "traceability architecture" to generate methods for evaluating and selecting reconnaissance and surveillance systems, and supported the Central Intelligence Agency's Office of Strategic Research's critique of the proposed Multiple Protective Shelter approach to the basing of the M–X missile. Mr. Keehn also claims that in the 1970s, he developed a new strategic targeting doctrine, developed an analytical approach for assessing the time-sensitive dynamic nature of strategic target value, developed

the concept of secondary indicators for arms control monitoring and verification, and developed a Strategic Arms Limitation Treaty verification strategy based upon the concept of noncompliance specification.

During the 1980s, Mr. Keehn alleges that he developed the Special Access Communication System, identified ten missions for the Inertial Upper Stage for operational support to strategic forces, identified ten satellite relay services in support of Department of Defense roles and missions, developed a series of electronic warfare methods against adversary satellites to enhance strategic operations from 1980 to 1987, and developed a utilization concept for retired boosters to enhance United States strategic operations. Plaintiff also claims that in March 1983, he presented his methodology regarding roles and missions for the Strategic Air Command's Space Master Plan, and, in November 1985, provided the United States Space Command with an approach to strategy and doctrine for military space systems. He claims that in the 1980s, "as a part of an internal project at **Northrop Grumman Corporation**, Plaintiff developed a series of space force structure planning databases," briefed the Strategic Air Command's Program Evaluation Group on Space as a Critical Strategic Arena, wrote the first briefing on strategic issues in space that was presented to President Reagan, authored the monograph "Strategic Utilization of Space Force Structures in a Protracted Strategic Conflict: A Net Assessment," and prepared for, and briefed, the first Air Force-wide symposium of space doctrine. (emphasis in original). Plaintiff further alleges that in the 1980s, he developed the dynamic deterrence approach to the M–X basing problem, developed presumptive Soviet targeting doctrine for its anti-satellite system, developed concepts for utilizing United States satellite negotiation assets to enhance United States strategic operations, developed operational concepts for utilizing Strategic Defense Initiative space systems to enhance United States strategic operations, and developed an easy-to-use flowchart for military strategy development and assessment.

In the 1990s, plaintiff claims to have developed an arms control monitoring and verification technology development plan, writing a systems engineering management plan for a billion-dollar space system. Finally, in the 2008–2009 time-frame, plaintiff allegedly developed a four-day course on the strategic concepts used during the Cold War to develop national security policy and guidance.

With the exception of the thirty-first claim, the development of the course on the strategic concepts used during the Cold War, undertaken in the 2008–2009 time-frame, the claims listed above occurred well before January 12, 2006, and, thus, are barred by the statute of limitations.

Despite the first thirty tasks accruing before January 12, 2006, Mr. Keehn "alleges that he is not in violation of the statute of limitation [sic] because the United States is still funding updated versions of plaintiff's original work to this day. Since various defense contractors, as well as the United Sates [sic], continue to benefit from Plaintiff's original work, Plaintiff asserts that the statue [sic] of limitations has not expired." Mr. Keehn appears to be trying to invoke the continuing claims doctrine,[5] and seems to suggest that an ongoing task or transaction should not be barred by the statute of limitations. In his response to the defendant's motion to dismiss, plaintiff states:

> Defendant cites *Brown Park Estates–Fairfield De. [sic] Co. v. United States* in stating that in order for the doctrine of continuing claim to apply "the Plaintiff must be inherently susceptible to being broken down into a series of independent and distinct events or wrong [sic], each having its own associated damages." Even a cursory reading of Plaintiff's Claim would determine that this is precisely what he did in his Claim. Thus, Defendant's assertion that its false statement is the basis for dismissal of Plaintiff's Claim is absurd, and does not warrant any serious consideration by the Court.

---

5. The doctrine has been referred to by the Federal Circuit as both the "continuing claims doctrine," *see Tamerlane, Ltd. v. United States*, 550 F.3d 1135 (Fed.Cir.2008), and the "continuing claim doctrine." *See Wells v. United States*, 420 F.3d 1343 (Fed.Cir.2005).

In response to plaintiff's claims, defendant argues that:

Despite the length of his complaint, we are still uncertain as to the starting date for any of his enumerated claims. As a result, as we have already mentioned, we are unable to determine if we can assert the statute of limitations as a defense or whether the continuing claim doctrine applies. Most importantly, without the stating date this Court cannot determine if Mr. Keehn's complaint was timely filed. Mr. Keehn simply responds that he has alleged sufficient facts for this Court to find that the continuing claim doctrine applies. Such a response cannot suffice to establish jurisdiction.

(internal citation omitted).

The Federal Circuit case of *Tamerlane, Ltd. v. United States*, 550 F.3d 1135, explained the continuing claims doctrine, as follows:

This doctrine applies where a plaintiff's claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed.Cir.1997). The doctrine allows "later arising claims even if the statute of limitations has lapsed for earlier events." *Tamerlane II*, 80 Fed. Cl. [724,] 736 [ (2008) ] (quoting *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed.Cir.1998)).

*Tamerlane, Ltd. v. United States*, 550 F.3d at 1145 (footnote omitted). In *Wells v. United States*, 420 F.3d 1343, the United States Court of Appeals for the Federal Circuit articulated the requirements for qualifying for the continuing claims doctrine, as follows:

"In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages.... However, a claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim."

*Id.* at 1345 (omission in original) (quoting *Brown Park Estates–Fairfield Dev. Co. v.*

*United States*, 127 F.3d 1449, 1456 (Fed.Cir. 1997)). In *Tamerlane, Ltd. v. United States*, 550 F.3d 1135, in which borrowers brought an action against the government for breach of Farmers Home Administration loan contracts, the Federal Circuit found that:

In this case, Appellants appear to improperly conflate the government's breach of the *original* loan agreements with the use restrictions that arose from the *incentive* loan agreements. That is, there is no second opportunity for breach of the original agreements just because the incentive agreements contain time-limited use restrictions. As the Court of Federal Claims correctly found, there was a single agreement that was breached on a single occasion, which does not allow any sort of "continuing claims" to be brought under the prevailing law of this Circuit.

*Id.* at 1146 (emphasis in original). The *Tamerlane* court then compared the facts in *Tamerlane* to the circumstances presented in *Ariadne Financial Services Pty. Ltd. v. United States*, 133 F.3d 874 (Fed.Cir.1998):

This situation is analogous to that in *Ariadne*, where we were confronted with a plaintiff who sought compensation from the government for repudiation of a contract that promised continuing performance into the future. 133 F.3d at 879. In finding that a single statutory repudiation made clear the government's intent to reject the terms of the contracts, we held that each subsequent denial of the promised contractual benefits did not give rise to a separate cause of action, and found that the continuing claims doctrine did not permit the plaintiff to obtain a second limitations period where the limitations period on the original breach had already expired. *Id.*

*Tamerlane, Ltd. v. United States*, 550 F.3d at 1146 n. 17; *see also Wagstaff v. United States*, 105 Fed.Cl. 99, 112 (2012) ("The continuing claims doctrine does 'not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time.'" (quoting *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d at 879)).

 Mr. Keehn should have brought suit once he believed he had rendered ser-

vices to the United States and was not remunerated for those services. To wait until 2012 to bring suit for alleged breaches of contract or takings violations that began accruing in the 1970s, 1980s, and 1990s runs afoul of this court's statute of limitations. Although Mr. Keehn did not specify beginning dates for the first thirty claims listed in his complaint, referring only to a range of years when describing the tasks he alleges to have accomplished, the years referred to are all well outside the statute of limitations period. The statute of limitations began to run when Mr. Keehn was able to bring his claims before the court, in other words, when "all the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action." *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed.Cir.), *cert. denied*, 558 U.S. 878, 130 S.Ct. 271, 175 L.Ed.2d 133 (2009). Although some of Mr. Keehn's claims refer to each other, for example, the March 1980 Monograph titled, "Strategic Utilization of Space Force Structures in a Protracted Strategic Conflict: A Net Assessment," is referred to in both the seventeenth and twenty-fifth claims, each claim seems to describe an isolated task. Plaintiff's complaint amounts to a series of alleged, unrelated "single agreements" that took place on "single occasions," *Tamerlane, Ltd. v. United States*, 550 F.3d at 1146, continued ill effects of these events notwithstanding. *See Brown Park Estates–Fairfield Dev. Co. v. United States*, 127 F.3d at 1456. The first thirty tasks, which occurred in the 1970s, 1980s, and 1990s, were not timely filed because the first thirty tasks did not occur within the six years prior to January 12, 2012, when Mr. Keehn filed his complaint. Moreover, the continuing claims doctrine is not applicable. Those first thirty claims, therefore, are barred by the statute of limitations.

The thirty-first claim, however, is not barred by the six-year statute of limitations. The thirty-first claim concerns a four-day short course on the strategic concepts to be used during the Cold War, which Mr. Keehn allegedly provided to the United States Air Force between 2008 and 2009. Plaintiff allegedly completed this task not at the request of a representative of the United States government, but rather "in response to" "[o]ne of the key recommendations articulated by the task force" on Department of Defense Nuclear Weapons Management. Plaintiff's thirty-first claim is based on two alternative theories: breach of an implied-in-fact contract and the Fifth Amendment Takings clause.

**Implied–in–Fact Contracts**

Mr. Keehn states that "[t]he Claim presented herein is based upon a series of enforceable implied-in-fact task order contracts." In reference to his thirty-one claims, Mr. Keehn alleges that he has "provided the government with the goods and services described in this Claim with the understanding that it would promote his career, lead to funded programs for the company, **Strategic Systems Sciences**, that he owned, and a host of other benefits. But Plaintiff did not realize any of these expected benefits." (emphasis in original). Mr. Keehn does not allege that he had any express contracts with the government. Indeed, in his response, he states: "as Plaintiff repeatedly stated in his Claim, there were never any formal contracts in any of the Tasks for which he seeks compensation ... as the Defendant is fully aware, there are no contracts associated with Plaintiff's Claim."[6] Plaintiff, however, argues that the government's alleged receipt and use of the goods and services described in his complaint constitute a series of implied-in-fact contracts.

In his complaint, Mr. Keehn also states: "Plaintiff has a case of [sic] centered upon [sic] lack of compensation for a series of enforceable implied-in-fact task-order contracts. As a result, two legal doctrines provide the basis for Plaintiff's Claim: unjust enrichment and quantum meruit." Quantum

---

**6.** Plaintiff contradicts this statement elsewhere in his response by indicating: "Since there was no expressed contract in 29 of the Tasks for which Plaintiff seeks compensation, (Tasks 5 & 6 are exceptions, as noted above)." Tasks 5 and 6 were for the alleged development of the Satellite Communication Relay concept while plaintiff was employed at the Boeing Company and the development of system and operational concepts for utilization of the Space Transportation System while plaintiff was employed at Northrop Grumman, respectively.

meruit and unjust enrichment, however, are generally related to implied-in-law contract claims, which are outside this court's jurisdiction. *See Lumbermens Mut. Cas. Co. v. United States,* 654 F.3d 1305, 1316 (Fed.Cir.), *reh'g denied* (Fed. Cir. 2011). Implied-in-fact contracts, however, can be jurisdictionally brought in this court, and are agreements " ' "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." ' " *Trauma Serv. Grp. v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997) (quoting *Hercules, Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio Ry. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923))); *see also Hercules, Inc. v. United States,* 516 U.S. at 423–24, 116 S.Ct. 981; *Bank of Guam v. United States,* 578 F.3d 1318, 1329 (Fed.Cir.2009) (citing *Trauma Serv. Grp. v. United States,* 104 F.3d at 1326); *Bay View, Inc. v. United States,* 278 F.3d 1259, 1265–66 (Fed.Cir.2001) (quoting *Trauma Serv. Grp. v. United States,* 104 F.3d at 1326), *reh'g and reh'g en banc denied,* 285 F.3d 1035 (Fed.Cir.), *cert. denied,* 537 U.S. 826, 123 S.Ct. 114, 154 L.Ed.2d 37 (2002); *Westlands Water Dist. v. United* States, No. 12–12C, 2013 WL 308638, at *21, 109 Fed.Cl. 177, 203–04 (Fed.Cl. Jan. 15, 2013); *Peninsula Grp. Capital Corp. v. United States,* 93 Fed.Cl. 720, 728 (2010) (citing *Baltimore & Ohio Ry. Co. v. United States,* 261 U.S. at 597, 43 S.Ct. 425 and *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977)). Such an agreement will not be implied "unless the meeting of minds was indicated by some intelligible conduct, act or sign." *Baltimore & Ohio Ry. Co. v. United States,* 261 U.S. at 598, 43 S.Ct. 425; *see also Russell Corp. v. United States,* 210 Ct.Cl. at 609, 537 F.2d at 482.

 "Plaintiff has the burden to prove the existence of an implied-in-fact contract." *Hanlin v. United States,* 316 F.3d 1325, 1328 (Fed.Cir.2003). " 'A well pleaded allegation of an express, or implied-in-fact, contract necessarily includes allegations going to each

of the requisite elements of a contract.' " *De Archibold v. United States,* 57 Fed.Cl. 29, 32 (2003) (quoting *McAfee v. United States,* 46 Fed.Cl. 428, 432, *appeal dismissed,* 243 F.3d 565 (Fed.Cir.2000)). "A party alleging either an express or implied-in-fact contract with the government 'must show a mutual intent to contract including an offer, an acceptance, and consideration.' " *Bank of Guam v. United States,* 578 F.3d at 1326 (quoting *Trauma Serv. Grp. v. United States,* 104 F.3d at 1325); *see also Chattler v. United States,* 632 F.3d 1324, 1330 (Fed.Cir.) (citing *Trauma Serv. Grp. v. United States,* 104 F.3d at 1325), *reh'g en banc denied* (Fed. Cir. 2011); *Hanlin v. United States,* 316 F.3d at 1328 (citing *City of Cincinnati v. United States,* 153 F.3d 1375, 1377 (Fed.Cir.1998)); *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.) ("The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract.") (citations omitted), *reh'g denied and en banc suggestion declined* (Fed. Cir.), *cert. denied,* 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997); *Toon v. United States,* 96 Fed.Cl. 288, 299–300, 299 n. 12 (2010); *Peninsula Grp. Capital Corp. v. United States,* 93 Fed. Cl. at 728 (citing *Total Med. Mgmt., Inc. v. United States,* 104 F.3d at 1319). The elements of a binding contract with the United States are identical for express and implied-in-fact contracts. *See De Archibold v. United States,* 57 Fed.Cl. at 32 (citing *Trauma Serv. Grp. v. United States,* 104 F.3d at 1325; *see also Flexfab, L.L.C. v. United States,* 424 F.3d 1254, 1265 (Fed.Cir.2005) (citing *Schism v. United States,* 316 F.3d 1259, 1278 (Fed.Cir.2002) (en banc), *cert. denied,* 539 U.S. 910, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003)); *Mastrolia v. United States,* 91 Fed.Cl. 369, 384 (2010) (citing *Flexfab, L.L.C. v. United States,* 424 F.3d at 1265); *Anderson v. United States,* 344 F.3d 1343, 1353 (Fed.Cir.2003) (citing *Cal. Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.

1990); and *Russell Corp. v. United States,* 210 Ct.Cl. 596, 537 F.2d at 481–82) (noting that to form either an express and implied-in-fact contract with the government, "four basic requirements must be met: (1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract."); *Rivera v. United States,* 105 Fed.Cl. 644, 650 (2012) (identifying the same four requirements to establish an implied-in-fact contract).

■■■■■■ The government "is not bound by its agents acting beyond their authority and contrary to regulation." *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1153 (Fed.Cir.1983) (citing *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)) (other citations omitted); *see also Chattler v. United States,* 632 F.3d at 1330; *Toon v. United States,* 96 Fed.Cl. at 299–300; *Gonzalez–McCaulley Inv. Grp., Inc. v. United States,* 93 Fed.Cl. 710, 714 (2010). Privity of contract between a plaintiff and the government, however, generally is required to bring a cause of action in the United States Court of Federal Claims for both express and implied contracts. *See Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998) ("Under the Tucker Act, the Court of Federal Claims has jurisdiction over claims based on 'any express or implied contract with the United States.'") 28 U.S.C. § 1491(a)(1) (1994). We have stated that "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government." *Ransom v. United States,* 900 F.2d 242, 244 (Fed.Cir.1990). In other words, there must be privity of contract between the plaintiff and the United States. *See Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984) ("The government consents to be sued only by those with whom it has privity of contract."); *see also S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 422 F.3d 1319, 1328 (Fed.Cir.) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim," but noting exceptions to this general rule (citing *Anderson v. United States,* 344 F.3d

at 1351; *United States v. Algoma Lumber Co.,* 305 U.S. 415, 421, 59 S.Ct. 267, 83 L.Ed. 260 (1939))), *reh'g and reh'g en banc denied* (Fed.Cir.2005), *cert. denied,* 548 U.S. 904, 126 S.Ct. 2967, 165 L.Ed.2d 950 (2006). Moreover, for a contract to be valid, it must be made and entered into with someone who can enforce the contract. In other words, with limited exceptions which do not apply here, the "government consents to be sued only by those with whom it has privity of contract." *Flexfab, L.L.C. v. United States,* 424 F.3d 1254, 1263 (Fed.Cir.2005) (quoting *Erickson Air Crane Co. of Wash. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984)); *see also City of El Centro v. United States,* 922 F.2d at 820.

■■■■ Defendant correctly contends that a contract must reflect that the parties had a meeting of the minds on essential terms, such as subject matter, the quantity involved, the time of performance, and the price. (citing *Prevado Vill. P'ship v. United States,* 3 Cl.Ct. 219 (1983)). Defendant argues that, to prove the existence of an implied-in-fact contract, Mr. Keehn must allege facts which, if true, would show that there was a valid contract consisting of an offer, acceptance, and consideration, and he must demonstrate that the individual binding the government had the authority to enter into contracts on behalf of the government. *See Barrett Refining Corp. v. United States,* 242 F.3d 1055, 1060 (Fed.Cir.2001). Defendant concludes, because Mr. Keehn does not "allege that he was in privity of contract with the United States," plaintiff has "failed to plead the jurisdictional prerequisites for assertion of breaches of implied-in-fact contracts."

In his response to defendant's motion to dismiss, plaintiff states:

One of the elements of privity is "mutuality of interest." The letters written by Lt. General George D. Miller and Vice Admiral William E. Ramsey clearly demonstrate a mutuality of interest between Plaintiff and the Department of Defense. Thus Defendant's assertion that "there is no basis upon which this Court can determine that Mr. Keehn was in privity of contract with the United States" is a false state-

ment. Defendant cites the lack of "privity of contract" as a basis for dismissing Plaintiff's Claim. But privity of contract assumes the existence of an expressed [sic] contract. Since there was no expressed contract in 29 of the Tasks for which Plaintiff seeks compensation, (Tasks 5 & 6 are exceptions, as noted above),[7] lack of "privity of contract" is not a basis for dismissing Plaintiff's Claim.

(citations omitted).

■■■ Mr. Keehn, however, has not demonstrated that the government intended to enter into a contract with the plaintiff as a result of the plaintiff's development of a four-day short course on the strategic concepts used during the Cold War to develop national security policy and guidance in the 2008–2009 time-frame. According to plaintiff's complaint, the "Department of Defense commissioned a study of the two nuclear mishaps that occurred in recent years. This effort, **The Task Force on DoD Nuclear Weapons Management**, was chaired by **former Defense Secretary James R. Schlesinger**, and resulted in a two-phase final report." (emphasis in original). According to plaintiff, in response to a key recommendation contained in the final report, Mr. Keehn "formed the Nuclear Deterrence Education Initiative." Nowhere in his description of the thirty-first task does Mr. Keehn state that plaintiff formed this initiative as the result of a contract with the United States, nor has plaintiff alleged facts from which an inference can be drawn to confirm that there was a meeting of the minds on key terms, such as price, that would imply the existence of a contract.

■■■ Mr. Keehn also has not demonstrated that he was in privity with the United States or that an official with authority to bind the United States entered into an implied-in-fact contract with plaintiff. As noted in *Anderson v. United States*, in order to "recover against the government for an alleged breach of contract," one requirement is "a government representative having actual authority to bind the United States in contract." *Anderson v. United States*, 344 F.3d

at 1353. As noted by a Judge of the United States Court of Federal Claims, "[t]o establish an implied-in-fact contract with the United States, a party must also show that 'the Government representative who entered or ratified the agreement had actual authority to bind the United States.'" *Sys. Planning Corp. v. United States*, 107 Fed.Cl. 710, 725 (2012) (quoting *Trauma Serv. Grp. v. United States*, 104 F.3d at 1325).

Plaintiff, however, alleges:

[T]hat the letters from written by Lt. General George D. Miller while Vice Commander–in–Chief of Strategic Air Command, and Vice Admiral William E. Ramsey, then-Deputy Commander–in–Chief of United States Space Command do in fact satisfy this requirement. In terms of Task Number 31, if Defendant can demonstrate that retired Air Force General Lance W. Lord is a serial liar, Plaintiff will withdraw his claim for Task 31.

Plaintiff claims General Lance W. Lord was the government representative with the requisite authority to bind the government in a contract for the thirty-first task. *See Anderson v. United States*, 344 F.3d at 1353. It appears that General Lord, however, was retired at the time that task thirty-one allegedly occurred, and plaintiff does not demonstrate that General Lord was authorized to bind the government. Furthermore, General Lord never requested that plaintiff complete a short academic course. Instead, Mr. Keehn "formed the Nuclear Deterrence Education Initiative" and the short academic course "in response to" "key recommendations" articulated by the Task Force on Department of Defense Nuclear Weapons Management. General Lord then helped plaintiff "capture the interest in his course from both former-Secretary Schlesinger, and the commander of the then-new Air Force Global Strike Command ... **Lt. General Frank G. Klotz**." (emphasis in original). General Lord then, allegedly, "inadvertently gave a copy of Plaintiff's course notes to General Klotz." At no point has plaintiff demonstrated that plaintiff spoke with an individual authorized

---

7. As noted above, tasks 5 and 6 were completed for the Boeing Company and Northrop Grumman, respectively.

to contract on behalf of the government, much less that plaintiff entered into an implied-in-fact contract with an individual with the requisite authority to bind the government. For these reasons, Mr. Keehn has failed to plead the essential elements for the existence of an implied-in-fact contract.

## Quantum Meruit and Unjust Enrichment

▮▮▮▮ Mr. Keehn also urges that the legal doctrines of unjust enrichment and quantum meruit provide a legal basis for his claims. Quantum meruit or unjust enrichment can be applied to claims for breaches of contracts implied in law in the appropriate circumstances. "An agreement implied in law is a 'fiction of law' where 'a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress.'" *Hercules, Inc. v. United States*, 516 U.S. at 424, 116 S.Ct. 981 (quoting *Baltimore & Ohio Ry. Co. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). "The Tucker Act confers upon the court [Court of Federal Claims] jurisdiction to hear and determine, *inter alia*, claims against the United States founded upon any 'express or implied' contract with the United States. 28 U.S.C. § 1491(a). We have repeatedly held that this jurisdiction extends to contracts either express or implied in fact, and not to claims on contracts implied in law." *Id.* at 423, 116 S.Ct. 981. Defendant correctly argues that this court does not have the jurisdiction to consider Mr. Keehn's implied-in-law claims. *See Trauma Serv. Grp. v. United States*, 104 F.3d at 1324–25 (quoting *Hercules, Inc. v. United States*, 516 U.S. at 424, 116 S.Ct. 981).

▮▮▮▮ "Quantum meruit is '[a] claim or right of action for the reasonable value of services rendered.'" *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329 (Fed.Cir. 2006) (quoting *Black's Law Dictionary* 1276 (8th ed. 2004)). The United States Court of Appeals for the Federal Circuit distinguishes two types of quantum meruit claims: implied-in-law and implied-in-fact. *See Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed.Cir.2007). An implied-in-law contract is

> a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice. The Court of Federal Claims, however, lacks jurisdiction over contracts implied in law. 28 U.S.C. § 1491(a)(1) (2000). On the other hand, "[w]here a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329–30 (Fed.Cir.2006).

*Int'l Data Prods. Corp. v. United States*, 492 F.3d at 1325–26; *see also Perri v. United States*, 340 F.3d 1337, 1343 (Fed.Cir.2003) ("Recovery in quantum meruit, however, is based upon a contract implied in law.") (citing *Fincke v. United States*, 230 Ct.Cl. 233, 246, 675 F.2d 289, 296 (1982)); *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed.Cir. 2001); *Terry v. United States*, 103 Fed.Cl. 645, 656 (2012); *Steinberg v. United States*, 90 Fed.Cl. 435, 443 (2009). Thus, the Court of Federal Claims does not have jurisdiction over implied-in-law contract claims, but does have jurisdiction over express and implied-in-fact contracts. Because recovery for plaintiff's quantum meruit claim is based upon a contract implied in law, the Court of Federal Claims does not have jurisdiction over Mr. Keehn's quantum meruit claims,[8] nor may

---

8. Plaintiff also apparently believes quantum meruit is a proper remedy for his Fifth Amendment taking claims. In *Perri v. United States*, 340 F.3d 1337, the United States Court of Appeals for the Federal Circuit, however, explained:

> We know of no case ... in which either we, the Court of Claims, or the Court of Federal Claims has permitted quantum meruit recovery in the absence of some contractual arrangement between the parties. In the present case, the Court of Federal Claims ruled that there was no contract between Perri and the government to pay him twenty-five percent of the amount the government received from the forfeiture that Perri alleged he aided the government in obtaining. The Court of Federal

the Court of Federal Claims permit recovery under quantum meruit absent some contractual arrangement between the parties. Mr. Keehn, therefore, may not seek recovery under quantum meruit for his claims.

■ Plaintiff claims that unjust enrichment is also an equitable principle "that no person (or organization) should be allowed to profit at another's expense without making restitution for the reasonable value of any property, services, or other benefits that have been unfairly received and retained." Although the elements of an unjust enrichment claim vary, plaintiff cites three elements of an unjust enrichment claim: "(1) the enrichment of the party accused of unjust enrichment; (2) that such enrichment was at the expense of the party seeking *restitution;* and (3) the circumstances were such that in *equity* and good conscience restitution should be made. An additional requirement is that the party accused of unjust enrichment must know of the benefit conferred; to ensure that the benefit was not *foisted* on the recipient, and is something for which compensation is reasonably expected." (emphasis in original). The United States Court of Federal Claims is a court of law, not a court of equity. *See United States v. Tohono O'Odham Nation,* — U.S. —, 131 S.Ct. 1723, 1729, 179 L.Ed.2d 723 (2011) (The United States Court of Federal Claims "has no general power to provide equitable relief against the Government or its officers."); *Massie v. United States,* 226 F.3d 1318, 1321 (Fed.Cir.2000) ("Except in strictly limited circumstances, *see* 28 U.S.C. § 1491(b)(2), there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief." (citing *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) ("[C]ases seeking relief other than money damages from the Court of Claims have never been 'within its jurisdiction'") and *Placeway Constr. Corp. v. United States,* 920 F.2d 903, 906 (Fed.Cir.1990))). Moreover, because plaintiff does not specify which elements or factors of an unjust enrichment claim apply to this case, and because this court does not have jurisdiction over implied-in-law contract claims, it cannot hear plaintiff's unjust enrichment claim.

## Fifth Amendment Takings Clause

■ Plaintiff alternatively claims that this court has jurisdiction to review his thirty-one claims pursuant to the Takings clause of the Fifth Amendment to the United States Constitution for the government's taking of his intellectual property without compensation. For a government action to constitute a taking, the government must seize private property for public use without just compensation. *See* U.S. Const. amend. V. The Takings clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)), *abrogated on other grounds by Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005), *recognized by Hageland Aviation Servs., Inc. v. Harms,* 210 P.3d 444 (Alaska 2009); *see also Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 123–24, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978); *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 536, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *E. Enters. v. Apfel,* 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Rose Acre Farms, Inc. v. United States,* 559 F.3d 1260, 1266 (Fed.Cir.), *reh'g en banc denied* (Fed. Cir. 2009), *cert. denied,* 559 U.S. 935, 130 S.Ct. 1501, 176 L.Ed.2d 109 (2010); *Janowsky v. United States,* 133 F.3d 888, 892 (Fed.Cir.1998); *Res. Invs., Inc. v. United States,* 85 Fed.Cl. 447, 469–70 (2009); *Pumpelly v. Green Bay & Miss. Canal Co.,* 80 U.S. (13 Wall.) 166, 179, 20 L.Ed. 557 (1871) (citing to principles which establish that "pri-

Claims correctly dismissed Perri's quantum meruit claim.

*Id.* at 1344.

vate property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified").

■ Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." *E. Enters. v. Apfel*, 524 U.S. at 520, 118 S.Ct. 2131 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016–19, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)); *see also Acceptance Ins. Cos. v. United States*, 503 F.3d 1328, 1336 (Fed.Cir.2007); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed.Cir.2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 12, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (quoting *United States v. Causby*, 328 U.S. 256, 267, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946)); *see also Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1368 (Fed.Cir.2005); *Narramore v. United States*, 960 F.2d 1048, 1052 (Fed.Cir.1992); *Perry v. United States*, 28 Fed.Cl. 82, 84 (1993).

■ To succeed under the Fifth Amendment Takings clause, a plaintiff must show that the government took a private property interest for public use without just compensation. *See Adams v. United States*, 391 F.3d 1212, 1218 (Fed.Cir.2004), *cert. denied*, 546 U.S. 811, 126 S.Ct. 330, 163 L.Ed.2d 43 (2005); *Arbelaez v. United States*, 94 Fed.Cl. 753, 762 (2010); *Gahagan v. United States*, 72 Fed.Cl. 157, 162 (2006). "The issue of whether a taking has occurred is a question of law based on factual underpinnings." *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377–78 (Fed.Cir.), *cert. denied*, 555 U.S. 1045, 129 S.Ct. 626, 172 L.Ed.2d 608 (2008). The government must

be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. *See St. Christopher Assocs., L.P. v. United States*, 511 F.3d 1376, 1385 (Fed.Cir. 2008).

■ The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. *See Klamath Irr. Dist. v. United States*, 635 F.3d 505, 511 (Fed.Cir.2011); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed.Cir.) (citing *M & J Coal Co. v. United States*, 47 F.3d 1148, 1153–54 (Fed.Cir.), *cert. denied*, 516 U.S. 808, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995)), *reh'g denied* (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139, 125 S.Ct. 2963, 162 L.Ed.2d 887 (2005). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. Then, the court must determine whether the government action is a " 'compensable taking of that property interest.' " *Huntleigh USA Corp. v. United States*, 525 F.3d at 1377 (quoting *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d at 1372).

■ To establish a taking, a plaintiff must have a legally cognizable property interest, such as the right of possession, use, or disposal of the property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (citing *United States v. Gen. Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *CRV Enters., Inc. v. United States*, 626 F.3d 1241, 1249 (Fed.Cir.2010), *cert. denied*, —— U.S. ——, 131 S.Ct. 2459, 179 L.Ed.2d 1211 (2011); *Karuk Tribe of Cal. v. Ammon*, 209 F.3d 1366, 1374–75 (Fed. Cir.), *reh'g denied and en banc suggestion denied* (Fed. Cir. 2000), *cert. denied*, 532 U.S. 941, 121 S.Ct. 1402, 149 L.Ed.2d 345 (2001). " 'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.' " *Am. Pelagic Fishing Co. v. United States*, 379 F.3d at 1372 (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed.Cir.2001), *cert. denied*, 535 U.S. 1077, 122 S.Ct. 1960, 152

L.Ed.2d 1021 (2002) and citing *Cavin v. United States*, 956 F.2d 1131, 1134 (Fed.Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d at 1372 (citing *Maritrans Inc. v. United States*, 342 F.3d 1344, 1352 (Fed.Cir.2003) and *M & J Coal Co. v. United States*, 47 F.3d at 1154). The court does not address the second step "without first identifying a cognizable property interest." *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed.Cir.) (citing *Am. Pelagic Fishing Co. v. United States*, 379 F.3d at 1381 and *Conti v. United States*, 291 F.3d 1334, 1340 (Fed.Cir.), *reh'g en banc denied* (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1112, 123 S.Ct. 904, 154 L.Ed.2d 785 (2003)), *reh'g denied and reh'g en banc denied* (Fed. Cir. 2005). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" *Huntleigh USA Corp. v. United States*, 525 F.3d at 1378 (quoting *Am. Pelagic Fishing Co. v. United States*, 379 F.3d at 1372).

"Plaintiff alleges that defendant took plaintiff's intellectual property without just compensation in violation of the Takings Clause of the Fifth Amendment to the Constitution," which he labels as either a patent or a copyright taking. In his complaint, plaintiff also states that 28 U.S.C. § 1498 (2006):

> explicitly provides a remedy for holders of a patent or copyright that is used without license by the United States Government. Said remedy permits the patent or copyright holder to seek relief in this Court. Given that patents and copyrights are two types of intellectual property, Plaintiff asserts that the intellectual property that is the subject of this Claim is likewise intended to be covered by this law since his

intellectual property could be either patented or copyrighted.[9]

Defendant argues that although "Mr. Keehn has alleged a Fifth Amendment Taking of his intellectual property, his claim alone cannot confer jurisdiction upon the Court. Even assuming for the purpose of this section only that Mr. Keehn has plead [sic] sufficient facts 'within the complaint … to permit the mounting of a proper defense,' related to his to copyright infringement claim, the copyright infringement claim or patent claim, under the facts plead [sic] in this case, cannot form the basis for a Fifth Amendment Takings cause of action." (quoting *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed.Cl. 30, 35 (1998)) (omission in original). Defendant further argues that "[t]he United States Court of Appeals for the Federal Circuit has determined that due to the exclusive nature of section 1498, [28 U.S.C. § 1498] claimants cannot bring a Fifth Amendment Takings claim in this Court premised upon patent and copyright infringement." Without noting the subsequent history, defendant quotes from the 2006 Federal Circuit decision in *Zoltek Corp. v. United States*: "'Congress provided a specific sovereign immunity waiver for a patentee to recover for infringement by the government. Had Congress intended to clarify the dimensions of patent rights as property interests under the Fifth Amendment, there would have been no need for the new and limited sovereign immunity waiver.'" (quoting *Zoltek Corp. v. United States*, 442 F.3d 1345, 1352 (Fed.Cir.2006), *vacated in part*, 672 F.3d 1309 (Fed.Cir.2012)).

Plaintiff responds:

> What Plaintiff indicated is that his work could have been either patented or copyrighted. He did not articulate this situation as clearly as he might have because he assumed that the Defendant would recognize the fact that most of the intellectual property for which he seeks compensation

9. Although plaintiff at times uses the terms interchangeably, patents and copyrights serve distinct functions. A patent is an exclusive right granted for a technical "invention" or a "process," 35 U.S.C. § 100 (2006). A copyright, however, is an exclusive right granted for the creation of an author's original works and "[c]opyright protec-

tion subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a) (2006).

became highly classified [10] upon its acceptance by the Government, thus making a patent or a copyright highly problematic vis-à-vis the goal of being integrated into National Security Policy and Guidance, or a hardware/software system program. But let it be perfectly clear: Plaintiff does in fact allege that the United States took his intellectual property, and used it without providing the Plaintiff compensation.... it is standard practice and common sense that intellectual property known to be sensitive from a national security perspective is only very rarely copyrighted or patented because of security concerns.... Legal niceties and citation of a large number of cases is simply more dismissive nonsense that lacks the substantive addressing of the issues raised by the Plaintiff's claim.

(internal citation omitted). To which defendant argues that, "Mr. Keehn basically disagrees with our analysis without providing any contrary authority for his ultimately unsupportable contention. Indeed, he concedes that he has not met the jurisdictional prerequisites for assertion of claims premised upon patent infringement." Therefore, defendant asserts, "[n]ot surprisingly, he does not offer, because there is none, any support for his contention that national security concerns can excuse the failure to obtain a patent or copyright. Mr. Keehn's admitted failure to comply with the jurisdictional requirements of 28 U.S.C. § 1498 constitutes a fatal defect to this Court's ability to exercise subject-matter jurisdiction."

Based on his descriptions of the thirty-one alleged tasks described above, Mr. Keehn seeks to describe his claims as creating either patent or copyright interests. Plaintiff bases his intellectual property infringement claim, in part, on 28 U.S.C. § 1498, which states:

(a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the

owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

. . .

(b) Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17, United States Code....

28 U.S.C. § 1498(a)-(b).

 The above quoted language of Section 1498(a) covers "a patent." In *Stroughter v. United States,* 89 Fed.Cl. 755 (2009), *appeal dismissed,* No. 2010–5095, 2010 WL 1687894 (Fed.Cir. Apr. 26, 2010), the *pro se* plaintiffs, sought damages of $1.25 trillion for infringement of a pending patent application. *Id.* at 758–59. The court dismissed the consolidated cases for lack of jurisdiction and stated:

The Court of Federal Claims' exclusive jurisdiction pursuant to 28 U.S.C. § 1498 over patent infringement claims against the Federal Government is conditioned on the issuance of a patent.... As it is a waiver of sovereign immunity, this statute is to be strictly construed *See Leesona Corp. v. United States,* 220 Ct.Cl. 234, 599 F.2d 958, 968 (1979). It does not grant the Court of Federal Claims jurisdiction over a claim for alleged infringement of an unis-

---

**10.** As noted above, after review ordered by the court, defendant, United States, determined that, "none of the information in any of the filings" contain protected or sensitive information.

sued patent. *See* § 1498(a) ("Whenever an invention *described in and covered by a patent* of the United States...." (emphasis added)); *Foster v. United States,* 230 Ct.Cl. 938, 938–39 (1982); *Fulmer v. United States,* 144 Ct.Cl. 812, 838 (1959); *Patton v. United States,* 110 Ct.Cl. 195, 75 F.Supp. 470, 473 (1948).

*Strougter v. United States,* 89 Fed.Cl. at 761–62 (second omission in original); see also *Martin v. United States,* 99 Fed.Cl. 627, 632 (2011) ("[S]ection 1498 does not grant the Court of Federal Claims jurisdiction over a claim for alleged infringement of an unissued patent." (citing 28 U.S.C. § 1498)). In *Demodulation v. United States,* 103 Fed.Cl. 794, 811 (2012), the court also indicated that the United States Court of Federal Claims does not have subject matter jurisdiction to adjudicate a claim of alleged patent infringement as a violation of the Takings Clause of the Fifth Amendment. Plaintiff's allegation of infringement of unissued patents must fail.

 Similarly, Mr. Keehn may not rely on 28 U.S.C. § 1498(b) as the jurisdictional vehicle for his copyright takings claims. Section 1498(b) "codifies a limited waiver of sovereign immunity for copyright infringement claims against the government and establishes this court as the exclusive forum to hear such claims." *Blueport Co., LLP v. United States,* 76 Fed.Cl. 702, 711 (2007), *aff'd,* 533 F.3d 1374 (Fed.Cir.2008), *cert. denied,* 555 U.S. 1153, 129 S.Ct. 1038, 173 L.Ed.2d 468 (2009); *see also Boyle v. United States,* 44 Fed.Cl. 60, 62–63 (1999), ("[T]he exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims." (quoting 28 U.S.C. § 1498(b))), *aff'd,* 200 F.3d 1369 (Fed.Cir.2000). As a condition to bringing suit for copyright infringement, a plaintiff must establish that the copyright has been registered, applied for, or denied by the United States Copyright Office.[11] In *Jennette v. United States,* a Judge of the United States Court of Federal Claims held that:

If the court construes plaintiff's Complaint as asserting copyright infringement of his name by the government, plaintiff must establish that the copyright is registered in accordance with the relevant provisions of the Copyright Act or the Copyright Office has refused to register the copyright. 17 U.S.C. § 411(a). Plaintiff has proffered no evidence of copyright registration nor the denial of copyright registration; plaintiff has not even asserted that he sought copyright registration in his Complaint or the attached documentation. Thus, this court lacks jurisdiction over any claims plaintiff might be asserting pursuant to 28 U.S.C. § 1498(b).

*Jennette v. United States,* 77 Fed.Cl. 126, 131–32 (2007). In *Walton v. United States,* 80 Fed.Cl. 251, the same Judge further elaborated, as follows:

> The relevant portion of 17 U.S.C. § 411(a) (2006) provides:
>
> > "[N]o action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights."
>
> The clear and plain language of the statute requires, as a condition to bringing suit, either the registration of the copyright or the Copyright Office's refusal to register the copyright. *See La Resolana Architects, PA [v. Clay Realtors Angel Fire],* 416 F.3d [1195] 1200–01 [ (10th Cir.2005), *abrogated by Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 130 S.Ct. 1237, 176 L.Ed.2d 18 (2010) ]. Such plain language ends the court's inquiry. Accordingly, the court holds that actual copyright registration, or the denial of copyright registra-

---

**11.** In *Walton v. United States,* 80 Fed.Cl. 251, 260–61 (2008), *aff'd,* 551 F.3d 1367 (Fed.Cir. 2009), the court described the two lines of cases

regarding whether application is sufficient to meet the requirements, or whether the application actually must be denied.

tion, is required prior to bringing suit for copyright infringement. *Walton v. United States*, 80 Fed.Cl. at 261; *see also Grayton v. United States*, 92 Fed.Cl. 327, 337 (2010). It is plaintiff's failure to have applied for, received, or been refused a copyright that prevents plaintiff from raising his claims in this court. *See* 17 U.S.C. § 411(a); *Walton v. United States*, 80 Fed. Cl. at 260. Moreover, plaintiff has not even alleged he applied for a copyright, much less registered for one, or alleged that his registration was refused.[12]

■ In sum, Mr. Keehn cannot assert an intellectual property infringement claim in this court, for either patent or copyright, with respect to any of the thirty-one tasks for which he claims entitlement to damages, having not demonstrated that he held a patent or copyright, or even applied for either. Plaintiff, therefore, cannot prove that he possesses a "cognizable property interest" in the subject of the alleged taking, nor can he prove that the government action is a " 'compensable taking of that property interest.' " *Huntleigh USA Corp. v. United States*, 525 F.3d at 1377 (quoting *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d at 1372). Furthermore, even if Mr. Keehn held a patent, or had a registered copyright or proof that a copyright application had been made or rejected for any of his thirty-one alleged tasks, plaintiff's Fifth Amendment takings theory is without merit. It is 28 U.S.C. § 1498(a), not the Fifth Amendment to the United States Constitution, that provides the waiver of sovereign immunity that enables a plaintiff to file suit against the government for patent infringement. *See generally Lamson v. United States*, 101 Fed.Cl. 280, 284–85 (2011). Similarly, "[i]t is 28 U.S.C. § 1498(b), not the Fifth Amendment to the United States Constitution, that provides the waiver of sovereign immunity that enables a plaintiff to file suit against the government for copyright infringement in the United States Court of Federal Claims.... Because 28 U.S.C. § 1498(b) provides the exclusive remedy for claims of copyright infringement against the government, plaintiff does not have a cognizable claim under the Fifth Amendment against the government." *Cohen v. United States*, 98 Fed.Cl. 156, 170 n. 12 (2011) (citing 28 U.S.C. § 1498(b)).[13]

**Declaratory Judgment**

■ Finally, plaintiff also seeks a declaratory judgment. The United States Court of Federal Claims does not have jurisdiction to grant the general equitable relief requested by plaintiff under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. The language of 28 U.S.C. § 2201 provides, with certain specified exceptions not applicable here:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The United States Court of Appeals for the Federal Circuit, however, has stated that:

> The Court of Federal Claims has never been granted general authority to issue declaratory judgments, and to hold that the Court of Federal Claims may issue a declaratory judgment in this case, unrelat-

---

**12.** Subsequent United States Supreme Court precedent indicated that the limitations of 17 U.S.C. § 411(a), may be more properly characterized as "a type of precondition to suit," rather than jurisdictional. The Court noted that, "Section 411(a) thus imposes a type of precondition to suit that supports nonjurisdictional treatment under our precedents." *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 130 S.Ct. 1237, 1247, 1248, 176 L.Ed.2d 18 (2010).

**13.** *Cohen* and *Lamson* also cite the earlier 2006 decision in *Zoltek Corp. v. United States*, 442 F.3d 1345, but *Cohen* and *Lamson* were decided before the 2012 *Zoltek* opinion, 672 F.3d 1309, which vacated, in part, the 2006 *Zoltek* opinion. With respect to the takings issue, the 2012 *Zoltek* court wrote: "Since the Government's potential liability under § 1498(a) is established, we need not and do not reach the issue of the Government's possible liability under the Constitution for a taking. The trial court's determinations on that issue are vacated." *Zoltek Corp. v. United States*, 672 F.3d 1309, 1327 (Fed.Cir.2012).

ed to any money claim pending before it, would effectively override Congress's decision not to make the Declaratory Judgment Act applicable to the Court of Federal Claims.

*Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716–17 (Fed.Cir. 1998);[14] *see also United States v. Tohono O'odham Nation*, 131 S.Ct. at 1729 (The United States Court of Federal Claims "has no general power to provide equitable relief against the Government or its officers."); *see also Massie v. United States*, 226 F.3d at 1321 ("Except in strictly limited circumstances, *see* 28 U.S.C. § 1491(b)(2), there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief." (citing *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) ("[C]ases seeking relief other than money damages from the court of claims have never been 'within its jurisdiction' ") and *Placeway Constr. Corp. v. United States*, 920 F.2d at 906)); *Smalls v. United States*, 87 Fed.Cl. 300, 307 (2009); *Pryor v. United States*, 85 Fed.Cl. 97, 103 (2008) ("Apart from ordering relief under 28 U.S.C. §§ 1491(a)(2) or (b)(2), the Court of Federal Claims has no power to grant a declaratory judgment.... The Court of Federal Claims cannot adjudicate a complaint that seeks only declaratory relief." (citing *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d at 717)); *Tchakarski v. United States*, 69 Fed.Cl. 218, 221 (2005). As plaintiff's requested relief does not meet the criteria under 28 U.S.C. § 1491(a)(2), or 28 U.S.C. § 1491(b)(2), this court cannot grant declaratory relief in this case.

## CONCLUSION

For the foregoing reasons, plaintiff has alleged no claims within the jurisdiction of this court. Plaintiff's claims based on the first thirty tasks are barred by the statute of limitations. The court does not have jurisdiction over plaintiff's thirty-first claim under either plaintiff's breach of implied-in-fact

contract or Fifth Amendment takings theory. Furthermore, plaintiff's quantum meruit or unjust enrichment doctrines do not provide him relief. Therefore, the court **GRANTS** defendant's motion to dismiss and **DISMISSES** plaintiff's complaint. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

---

**14.** The court notes that both the Patent Act, 35 U.S.C. § 283, and the Copyright Act, 17 U.S.C. § 502(a), state that courts "may" issue injunctive relief, in the case of the Patent Act, "in accordance with principles of equity," and in the case of the Copyright Act, "on such terms as it may deem reasonable to prevent or restrain infringe-ment of a copyright." The United States District Courts, however, have jurisdiction under the Patent Act and the Copyright Act. *See* 28 U.S.C. § 1338 (2006). As noted above, this court's jurisdiction for patent and copyright claims arises under 28 U.S.C. § 1498, which does not specifically address injunctive relief.